# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| A pink/peach Samsung cellular phone with IMEI 351488824003851 and a blue Motorola cellular phone with IMEI 351488824003851, both seized on August 2, 2022, as described more fully in Attachment A. | ) ) ) ) ) ) | Case No. **2:22-MJ-03149** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), 846 | Possession with Intent to Distribute Controlled Substances; Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_/s/ Sean D. Lusk_____
*Applicant's signature*

TFO Sean D. Lusk
*Printed Name and Title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.
Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____    Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed Name and Title*

AUSA: Kathrynne Seiden (x0631)

**ATTACHMENT A**

ITEMS TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on August 2, 2022, and currently maintained in the custody of the Federal Bureau of Investigation in Santa Maria, California:

1.   A pink/peach Samsung cellular phone with IMEI # 351488824003851.

2.   A blue Motorola cellular phone with a cracked screen, seized on August 2, 2022, from the person of Timothy Daniel Espinoza.

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Subject Offenses"), namely:

a.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

      e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      f.    Contents of any calendar or date book;

      g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.    evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the SUBJECT DEVICES beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        h.  If the search determines that a SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress MCLAUGHLIN's and/or ESPINOZA's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and

direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MCLAUGHLIN's and/or ESPINOZA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Sean D. Lusk, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), seized on August 2, 2022 and currently in the custody of the Federal Bureau of Investigation ("FBI") in Santa Maria, California, as described more fully in Attachment A:

a.     A pink/peach Samsung cellular phone with IMEI 351488824003851, seized on August 2, 2022 ("SUBJECT DEVICE 1").

b.     A blue Motorola cellular phone with a cracked screen, seized on August 2, 2022 from the person of Timothy Daniel Espinoza ("ESPINOZA") ("SUBJECT DEVICE 2").

2.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substance) and 846 (conspiracy and attempt to distribute controlled substance) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement reports, and my review of evidence in this case, including body and patrol vehicle dash camera footage and 911 and California Highway

Patrol ("CHP") Dispatch audio recording.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

## II. BACKGROUND OF AFFIANT

4.    I am a Task Force Officer ("TFO") with the FBI assigned to the Central Coast Safe Streets Task Force.  I am also employed as a full-time, sworn law enforcement officer for the CHP and have been for the past 23 years.  I am currently assigned to the Coastal Division Investigative Services Unit. My primary responsibility is to investigate and assist other officers and allied agencies with in-depth investigations involving criminal street gangs, weapons, and narcotics violations.

5.    I attended and graduated from the California Highway Patrol Academy and hold Basic, Intermediate, and Advanced Certificates from California Peace Officer Standards and Training.  I have completed a 72-hour Drug Recognition Expert course certified by the International Association of Chiefs of Police and over 80 hours of narcotics and criminal interdictions training relating to the transportation, concealment, trends, and sales of illegal narcotics and other criminal activities.  I have spoken on numerous occasions with other officers and

experts in the field of narcotics interdiction regarding current trends on narcotic sales and trafficking.

6.    As a TFO, I have participated in numerous investigations involving federal firearm and drug offenses and participated in the execution of numerous arrest and search warrants.  I have also participated in the interviews of defendants, informants, and witnesses who had personal knowledge of firearm and drug trafficking methods.

### III.  SUMMARY OF PROBABLE CAUSE

7.    On August 2, 2022, Lorianne Kanani McLaughlin ("MCLAUGHLIN") called 911 to report that she was being physically assaulted by her boyfriend in a car.  CHP officers found MCLAUGHLIN sitting in the backseat of a car parked near the off-ramp of the U.S. 101 freeway and found MCLAUGHLIN's boyfriend, ESPINOZA, nearby.

8.    After interviewing MCLAUGHLIN and ESPINOZA, officers arrested ESPINOZA for domestic violence.  As they were doing so, ESPINOZA made spontaneous statements indicating that MCLAUGHLIN was keeping drugs in the car.  One of the CHP officers also saw drug paraphernalia sitting in an open toiletry case in the car.  A drug detection dog alerted to the possible presence of drugs near the center console.  Officers searched the car and found approximately 517.4 grams of methamphetamine.

9.    Officers seized SUBJECT DEVICE 1 from the back passenger area, near where MCLAUGHLIN had been sitting. Officers seized SUBJECT DEVICE 2 from ESPINOZA's person.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my training and experience, my conversations with law enforcements officers, my personal observations, and my review of the law enforcement reports related to and evidence seized during MCLAUGHLIN's and ESPINOZA's arrests, including body and patrol vehicle dash camera footage and 911 and CHP Dispatch audio recordings, I am aware of the following information.

### A.   CHP Dispatch Relays 911 Calls Related to an SUV

11.   On August 2, 2022, around 10:59 a.m., CHP Dispatch broadcasted a "be on the look out" ("BOLO") for an older brown SUV.  A caller had reported that the SUV was speeding, an occupant was throwing bottles out the window, and a passenger in the back seat was waving at passing motorists.  The reporting party relayed that the vehicle exited the southbound U.S. 101 freeway at Los Alamos and "stopped all crazy."

12.   Approximately nine minutes later, at 11:08 a.m., CHP Dispatch told CHP Officer Medina to respond to the Bell Street off-ramp of the U.S. 101 freeway for a possible domestic violence incident that occurred near the Los Alamos exit.  An individual later identified as MCLAUGHLIN had called 911 and told the operator that her boyfriend, later identified as ESPINOZA, was physically assaulting her from inside a silver Chevrolet Suburban.  Both MCLAUGHLIN and ESPINOZA then called 911 several times to report each other.

13.   CHP Dispatch told Officer Medina that the car from the BOLO call might be the same one related to the domestic violence call.

**B.   CHP Officer Medina Locates MCLAUGHLIN and ESPINOZA**

14.   At approximately 11:12 a.m., Officer Medina saw a silver Chevrolet Suburban parked on Bell Street and Cat Canyon Road, near the northern Los Alamos exit of the southbound U.S. 101 freeway.  MCLAUGHLIN was seated in the rear seating area, which had been converted into a sleeping area, with the door open.  Officer Medina spoke with MCLAUGHLIN about the reported incident and asked MCLAUGHLIN whether she needed medical attention, which she declined.  At approximately 11:18 a.m., Officer Gruver arrived on scene to assist Officer Medina with interviewing MCLAUGHLIN.

15.   Meanwhile, at approximately 11:17 a.m., CHP Officers Larson and Jacobs located ESPINOZA, standing approximately 150 yards south of the Suburban, at the intersection of Bell Street and Cat Canyon Road.  Officer Larson saw that ESPINOZA was holding SUBJECT DEVICE 2.  Officer Larson searched ESPINOZA for weapons, handcuffed him, and placed his property, including SUBJECT DEVICE 2, into a secure bag.  Officer Larson and Officer Jacobs then transported ESPINOZA by car back to Officer Medina, near the Suburban.

16.   After ESPINOZA arrived back at Officer Medina's location, officers removed ESPINOZA's handcuffs and Officer Medina interviewed ESPINOZA about the alleged domestic violence incident.

17.   Meanwhile, CHP Officer Gruver interviewed MCLAUGHLIN while she was seated in the left rear seat area of the SUBJECT VEHICLE.  CHP Officer Jacobs assisted Officer Gruver.  According to Officer Jacobs' report, Officer Jacobs could smell the strong odor of unburnt marijuana coming from within the Suburban. Officer Jacobs also saw an open toiletry bag containing a small glass pipe that Officer Jacobs knows to be commonly utilized for smoking narcotics.  Officer Jacobs also noted two small glass mirrors with a clear powdery substance on top, near the instrument panel.

18.   At approximately 11:58 a.m., Officer Medina arrested ESPINOZA for felony domestic violence.

19.   While Officer Medina was handcuffing ESPINOZA, ESPINOZA made a spontaneous statement to Officer Medina and CHP Sergeant Ferguson, referring to MCLAUGHLIN as a "fucking drug dealer."  ESPINOZA suggested that the officers were going to let MCLAUGHLIN "get away with all those drugs" in her car.  ESPINOZA added that MCLAUGHLIN had "over half a fucking pound in there."

20.   After ESPINOZA was arrested, Sergeant Ferguson related ESPINOZA's statement about the drugs to Officer Jacobs.  Officer Jacobs directed his drug detection dog, Rudi, to conduct an exterior sniff of the car.  Officer Jacobs noted that Rudi had an obvious change of behavior at the passenger door.  Officer Jacobs directed Rudi inside the car and Rudi had an immediate "focused indication" towards the center console area, reflecting a positive alert indicating the presence of drugs or items recently contaminated with the odor of drugs in that location.

### C.   Officers Search the Suburban and Find SUBJECT DEVICE 1 and Suspected Narcotics

21.   Officers then searched the Suburban.  Underneath the cup holder area in the center console, officers found plastic packaging containing what the officers suspected was methamphetamine.  Officers also found additional suspected narcotics, including heroin and marijuana, in the passenger compartment, along with several empty re-sealable plastic bags.

22.   During the search of the car, CHP Officer Larson seized SUBJECT DEVICE 1 from the rear seating area, which had been converted into a sleeping area.

23.   At approximately 12:46 p.m., Officers arrested MCLAUGHLIN for felony narcotics transportation for the purpose of sales.  Officers had the Suburban towed and impounded.

24.   Based on records retrieved by CHP, the car is registered to MCLAUGHLIN at an address in Orcutt, California.

25.   The SUBJECT DEVICES are currently in the custody of FBI in Santa Maria, California.

### D.   The Suspected Narcotics Test Presumptively Positive for Methamphetamine

26.   On August 8, 2022, I obtained the evidence seized by CHP on August 2, 2022.  I observed three plastic packages, including two Ziploc plastic bags and one plastic container containing suspected methamphetamine, weighing 517.4 grams in total.  I conducted a field test of the substance from each of the three packages.  All three tested presumptively positive for methamphetamine.

27.   I processed and sent each of the three packages to the Drug Enforcement Agency Southwest Laboratory for chemical analysis.  I processed and placed the remaining items I obtained from CHP, including the SUBJECT DEVICES, into evidence.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

28.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

29.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

30.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MCLAUGHLIN's and/or ESPINOZA's thumb

and/or fingers on the device(s); and (2) hold the device(s) in front of MCLAUGHLIN's and/or ESPINOZA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>**CONCLUSION**</u>

34.   For the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in within the SUBJECT DEVICES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___ day of
August, 2022.


_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE